IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CHAUNTIEMARIE BROWN,            )
on behalf of Q.B., a minor,      )
                                 )
                Plaintiff,       )
                                 )
        v.                       ) Civ. No. 12-149-GMS
                                 )
CAROLYN W. COLVIN,               )
Acting Commissioner of Social    )
Security,                        )
                                 )
                Defendant.[1]    )

## **MEMORANDUM**

## I.    **INTRODUCTION**

The plaintiff Chauntiemarie Brown ("Brown"), who appears pro se, appeals from the

decision of the defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("the

Commissioner"), denying the application Brown filed on behalf of her son, Q.B., for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act").

42 U.S.C. § 1381 et seq.  The court has jurisdiction pursuant to 42 U.S.C. § 405(g).[2]

Currently before the court is Brown's opening brief for an award of benefits, construed as

a motion for summary judgment, and the Commissioner's motion for summary judgment.  (D.I.

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security, effective
February 14, 2013, to succeed Commissioner Michael Astrue, whose term expired on February
13, 2013.  Pursuant to Fed. R. Civ. P. 25(d)(1) and 42 U.S.C. § 405(g), Carolyn W. Colvin is
automatically substituted as the defendant in this action.

[2]Under § 405(g), [a]ny individual, after any final decision of the Commissioner of Social
Security made after a hearing to which he was a party . . . may obtain a review of such decision
by a civil action commenced within sixty days after the mailing to him of notice of such decision
. . . .  Such action shall be brought in the district court of the United States for the judicial district
in which the plaintiff resides . . . .  42 U.S.C. § 405(g).

15, 19.) For the reasons set forth below, Brown's motion will be denied and the Commissioner's motion will be granted.

## II. BACKGROUND

### A. Procedural History

Q.B. was born on June 20, 2006. Brown filed a claim for SSI on behalf of her son, Q.B., on August 1, 2008, alleging disability since June 20, 2006, due to an imperfect anus, two missing vertebrae, and VACTERL association.[3] (D.I. 11, Tr. 30, 70-76.) Brown's application was denied initially and on reconsideration. (*Id.* at 28-39.) Thereafter, Brown requested a hearing which took place before an administrative law judge ("ALJ") on June 24, 2010. Counsel represented Brown at the hearing, and Brown testified on Q.B.'s behalf. (*Id.* at 773-92.)

On July 21, 2010, the ALJ issued an unfavorable decision, finding Q.B. not disabled from August 1, 2008 (the date of the SSI application) to the date of her decision. (*Id.* at 9-27.) Brown sought review by the Appeals Council, but it denied her request for review and, therefore, the ALJ's decision became the final agency decision subject to judicial review. (*Id.* at 4-6.) On February 8, 2013, Brown, proceeding *pro se*, filed the current action for review of the final decision. (D.I. 2.)

---

[3] A syndrome seen in embryos and fetuses characterized by abnormalities of vertebrae (V), anus (A), cardiovascular tree (C), trachea (T), esophagus (E), renal system (R), and limb buds (L), associated with the administration of sex hormones during early pregnancy. *The American Heritage Stedman's Medical Dictionary* 863 (2d ed. 2004).

**B. Background**

### 1. Medical history

Q.B. was born with an imperforate[4] anus and VACTERL association. (D.I. 11, Tr. 145,

167, 186.) A diverting colostomy was performed, and Q.B. was discharged home with home

health care services recommended. (*Id.* at 186-88, 191-92, 260.) In September 2006, Q.B.

underwent a posterior saggital analrecoplasty to reconstruct his perianal area. (*Id.* at 360-61.)

Post-surgery he was doing well at home, and the incision was healing well. (*Id.* at 596-97,

600-01.) On December 1, 2006, Q.B. underwent an elective take down of the looped colostomy.

(*Id.* at 414-18.)

Treatment notes from 2007 indicate that Q.B. ate well, was growing, gaining weight, was

active, and his voiding and stooling patterns were normal. (*Id.* at 532, 534, 536, 538, 554, 556.)

Q.B. was status post Pena for imperforate anus with good medical control, and was healing

properly. (*Id.* at 532, 554.) Brown was instructed to add Benefiber or Pectin to his diet and to

limit intake of bananas, apples, white bread, and rice. (*Id.* at 535.) Q.B. met his developmental

milestones. (*Id.* at 548, 559, 577.) Examination revealed that Q.B. had normal muscle strength,

no thoracic prominence, and no neurological or musculoskeletal deficits. (*Id.* at 549, 557, 577,

579.)

On January 2, 2008, Brown reported to orthopedic surgeon Peter Gabos ("Dr. Gabos")

that Q.B. was doing very well and he continued to meet all of his milestones (including walking

and running without delay or difficulties). (*Id.* at 530.) Q.B. had mild right lower thoracic

---

[4]Lacking a normal opening. *The American Heritage Stedman's Medical Dictionary* 401
(2d ed. 2004).

curvature, with no midline deformity, no significant prominences of the thoracic or lumbar regions, neurovascularly intact, and motor strength 5/5 in the bilateral lower extremities with equal muscle tone. (*Id.* at 531.) Dr. Gabos indicated that Q.B. was "doing well," . . . "no treatment indicated yet." (*Id.*) The impression was congenital hemivertebrae at T9 and stable curvature. (*Id.*)

On January 7, 2008, pediatrician Nelson Santos ("Dr. Santos") performed a routine check-up of Q.B. (*Id.* at 527.) Brown reported no concerns. (*Id.*) Q.B.'s sleeping was within normal limits; his voiding and stooling patterns were normal; and he was well-developed and well-nourished with a healthy weight. (*Id.* at 527-28.) Dr. Santos noted no musculoskeletal deformities or neurological deficits. (*Id.* at 528.) Q.B. could run, kick a ball, and walk upstairs holding a hand; feed himself with spoon; turn a single page; remove his clothes; identify some body parts; use at least four to ten words; do prodeclarative pointing; and begin to pretend play. (*Id.* at 529.) His assessment was a well toddler with healthy weight and normal development. (*Id.* at 528.) On January 15, 2008, Brown told Stephen P. Dunn, M.D. ("Dr. Dunn"), that Q.B. continued to have multiple stools per day that were mushy in consistency, but he ate well and his activity level was normal. (*Id.* at 525.) Dr. Dunn noted that Q.B.'s abdomen was soft and non-tender with no masses, his incision was well-healed, and his anus was not prolapsed. (*Id.*)

In February 2008, Brown filled out a function report wherein she indicated that Q.B. had no problems with talking, understanding, and learning; his physical abilities were not limited; his impairment did not affect his behavior with other people; and his ability to help take care of his personal needs was not limited. (*Id.* at 95-100.) An August 2008 Function Report submitted by Brown was very similar to the February 2008 report with the exception that Brown indicated

4

Q.B.'s impairment affected his behavior with others. (*Id.* at 112-18.) In that regard, Brown indicated that Q.B. was affectionate towards his parents, played next to (but not with) other children, and could play catch or simple games with other children. (*Id.* at 117.)

Dr. Dunn saw Q.B. on April 16, 2008. (*Id.* at 522.) Q.B. was "very active," growing, gaining weight, and "eating everything in [sight]." (*Id.* at 522-23.) He had four to five mushy stools per day. (*Id.* at 522.) Q.B.'s bowel regimen consisted of Benefiber and prune juice. (*Id.* at 523.) An x-ray showed a large amount of stool in Q.B.'s colon, but no obstructions. (*Id.* at 524.) Vilma Davis, A.R.N.P. ("Davis"), noted that Q.B. was eating, drinking, and sleeping well; he had no diarrhea and was not vomiting; and was alert, cooperative, and playful. (*Id.* at 520-521.)

Q.B. had a follow up appointment with Dr. Gabos on July 2, 2008 for his congenital scoliosis and congenital hemivertebrae at T9. (*Id.* at 505-506.) The child was doing well, there was no back or lower extremity pain, tingling, numbness, or weakness. (*Id.* at 506.) On examination, he was well-nourished and well-developed and appeared his stated age; his neck had a full range of motion; he had a mild right lower thoracic curvature; he had no evidence of shoulder height asymmetry or pelvic obliquity; he was nontender to palpation over the spinous process and paraspinal musculature; he had full and symmetric range of motion at his hips; he ambulated with a non-antalgic gait; he had no neurological deficits; and his reflexes were normal. (*Id.* at 506-07.) Dr. Gabos recommended no treatment and stated that Q.B. could participate in all activities without restriction. (*Id.* at 507.)

Dr. Santos evaluated Q.B. for a routine check-up on July 7, 2008. (*Id.* at 500.) Q.B.'s diet was well-balanced, his sleeping was within normal limits, and his voiding and stooling

5

patterns were normal. (*Id.*) Q.B. had a healthy weight and normal physical development, and he had no musculoskeletal or neurological deficits. (*Id.* at 501.) Brown reported that Q.B. participated in physical activity at least one hour each day; he could kick a ball, go up and down stairs one at a time, copy a line with a crayon, remove his clothes, use two-word sentences, and imitate adults. (*Id.* at 504.)

On July 15, 2008, Brown told Dr. Dunn that she had no complaints and that Q.B. was not having significant problems with constipation. (*Id.* at 499.) Q.B. was well-developed and in no distress; he was walking and moving normally; his neoanus was well-formed with minimal prolapse along the left margin; and a rectal examination was normal. (*Id.*)

On September 8, 2008, Dr. Dunn noted that Q.B. was taking Senokot daily and had been having "reasonably good stools." (*Id.* at 663.) Brown reported that Q.B. had some blood in his diaper, but no episodes of abdominal pain. (*Id.*) On examination Q.B. looked well; he was very active and very chatty; his abdomen was soft; and his neorectum had a small amount of prolapse on the left side. (*Id.*) A film indicated that Q.B. had quite a bit of stool in his upper abdomen, for which Dr. Dunn recommended Q.B. take a capful of MiraLAX® once or twice a day until he was fully cleaned out, but Q.B. did not need an enema. (*Id.*)

In September 2008, state agency physician Dr. Sandra Hassink ("Dr. Hassink") filled out a "Child Disability Evaluation Form" after reviewing Q.B.'s records. (*Id.* at 490-95.) Dr. Hassink found that Q.B. had an impairment or combination of impairments that were severe, but did not meet, medically equal, or functionally equal the listings. (*Id.* at 490.) Dr. Hassink indicated that Q.B. had a "less than marked" limitation in the domain of health and physical well-being, but no limitation in any of the remaining five of domains of functioning for purposes

6

of evaluating functional equivalence. (*Id.* at 492.) In October 2008, after reviewing Q.B.'s records, state agency physician Dr. Jose Acuna ("Dr. Acuna") affirmed Dr. Hassink's findings. (*Id.* at 633-37.)

On October 2, 2008, Dr. Dunn determined that Q.B. was having problems with constipation. (*Id.* at 496.) An abdominal x-ray showed moderate gas within Q.B.'s bowels, a moderate amount of stool in his colon and rectum, but no abnormal masses or calcifications. (*Id.*) Dr. Dunn noted that Q.B. "look[ed] well and [was] in no distress." (*Id.*) His abdomen was soft with no masses or distention. (*Id.*) Q.B. was not receiving any supplements to aid with stooling, and Dr. Dunn started Q.B. on Senokot. (*Id.*)

In November 2008, Q.B. was experiencing constipation, and Brown was instructed to start a children's Fleet enema for four nights and give Q.B. two squares of ex-lax® every night. (*Id.* at 650-52.) Brown was unable to follow the recommended regimen, and Q.B. continued to have multiple stools per day. (*Id.* at 650.) During a December 2008 examination, Dr. Dunn noted that Q.B.'s abdomen was flat without masses or tenderness, the left side of the colon was reasonably clean, and he was stable on his current regimen. (*Id.* at 647.) Dr. Dunn assisted Brown in filling out an SSI application, and opined that Q.B. has "been denied SSI without appropriate cause as far as I can determine." (*Id.* at 646.) Dr. Dunn stated, "[Q.B.] has a congenital abnormality with life long implications that include adjustment problems and socialization problems." (*Id.*)

When Q.B. presented on January 14, 2009, there were no complaints of back pain, tingling, numbness, tingling down the extremities, or urinary or bowel incontinence. (*Id.* at 664.) Examination revealed that Q.B. was alert and cooperative; he had no extremity musculoskeletal

7

defects or neurological deficits; and his reflexes were normal.  (*Id.* at 753.)  Dr. Gabos

recommended continuous observation, noted that Q.B. may continue to participate in activities as

tolerated, and suggested that Q.B. return in ten months.  (*Id.*)

During a routine visit on January 29, 2009, Dr. Dunn noted that Q.B. had constipation

and was taking senna[5] every other day, but had no abdominal pain.  (*Id.* at 751.)  His abdomen

was flat with a well-healed scar and his neoanus was well-healed without prolapse of rectal

tissue.  (*Id.* at 752.)  Dr. Dunn found that Q.B. was doing well, and decreased his dosage of

senna.  (*Id.*.)  During a routine follow-up examination on March 4, 2009, there were no

complaints of abdominal pain, the abdomen was soft without masses, and no perianal

abnormality.  (*Id.* at 745-746.)  An abdominal x-ray revealed no bowel obstruction or other acute

abnormality.  (*Id.* at 746.)

During a June 3, 2009 follow up for evaluation of chronic bowel dysfunction, Dr. Dunn

noted that Q.B. had been doing well at home, was growing and developing well, with no

complaints of abdominal pain.  (*Id.* at 741.)  An abdominal x-ray showed stool in the colon, but

no significant constipation.  (*Id.*)  Q.B. was not taking ex-lax® because he did not like the taste

of it, so Dr. Dunn ordered a product called Pedia-Lax®.  (*Id.*)  Dr. Dunn concluded that Q.B. was

"doing pretty well and . . . [was] still young enough that we do not have to be too concerned

about his lack of potty training."  (*Id.*)

On September 10, 2009, Dr. Dunn noted that Q.B. recently had constipation and had a

mild prolapse of the left side of his neoanus which improved with MiraLAX®.  (*Id.* at 734.)  Dr.

---

[5]A plant of the genus Cassia, used as a laxative. *The American Heritage Stedman's Medical Dictionary* 744 (2d ed. 2004).

Dunn referred Q.B. to pediatric surgeon Dr. Charles D. Vinocur ("Dr. Vinocur").  Dr. Vinocur

evaluated Q.B. on September 14 and 21, 2009.  (*Id.* at 728, 731.)  Brown indicated to Dr.

Vinocur that she knew little about Q.B.'s daily stool habits since he spent much of his time at

daycare, but she reported that he stooled less frequently than before and woke up clean in the

morning.  (*Id.* at 728, 732.)  On examination, Q.B.'s abdomen was soft and nontender.  (*Id.* at

728.)  Dr. Vinocur started Q.B. on a two ex-lax® at night regimen.  (*Id.*)  Dr. Vinocur would not

address Q.B.'s rectal prolapse until he could get the stooling under control.  (*Id.*)

On October 5, 2009, Brown reported Q.B.'s decreased frequency of stooling since he

was place on two ex-lax® before bed.  (*Id.* at 725.)  On examination, Q.B.'s abdomen was soft,

non-tender, non-distended, with no masses detected, and normal bowel sounds; he had no rectal

prolapse; and he had no musculoskeletal or neurological deficits.  (*Id.*)  Dr. Vinocur was

"very pleased with the progress we have made thus far," and recommended an increase to three

ex-lax® per day to improve motility and evacuation.  (*Id.* at 726.)  On October 9, 2008, Q.B.

presented to Dr. Vinocur for follow-up.  (*Id.* at 719.)  At that time, Brown reported that she had

completely stopped administering laxatives a week prior to the visit due to blisters forming on

Q.B.'s buttocks and that she had noted no change in his bowel habits when taken off the bowel

regimen.  (*Id.*)  Dr. Vinocur found rectal prolapse on examination and recommended that Q.B.

resume a regular bowel regimen with two ex-lax® per day and to use a skin ointment after each

bowel movement.  (*Id.* at 721.)

On November 13, 2009, Q.B. presented for a follow up evaluation of his congenital

scoliosis and hemivertebrae at T9.  (*Id.* at 716.)  Dr. Douglas A. Scott ("Dr. Scott") noted that

Q.B. had no back pain, numbness, tingling down the extremities, urinary or bowel incontinence,

or musculoskeletal or neurological deficits; his range of motion was normal; and he had no tenderness to palpation. (*Id.* at 716-17.) He had mild right thoracic prominence, but x-rays showed no major curve progression. (*Id.* at 717.) Dr. Scott indicated that Q.B. could continue to participate in activities as tolerated, and recommended that he return in one year to assess progression of the scoliosis. (*Id.*)

During a November 23, 2009 visit, Dr. Vinocur noted that Brown had forgotten a summary of Q.B.'s bowel management and could not relate much except that Q.B.'s bottom was better and well-healed. (*Id.* at 714.) Q.B. was taking two ex-lax® squares per day. (*Id.*) Dr. Vinocur explained that Brown should increase Q.B.'s intake to two and one-half to three squares, but he was unsure if Brown understood. (*Id.* at 715.) Dr. Vinocur stated, "I think we may need to get social services involved." (*Id.*)

On January 11, 2010, Brown reported that Q.B. was a poor eater. (*Id.* at 643.) Dr. Vinocur noted that upon examination, Q.B. was well-hydrated, well-developed, and healthy. (*Id.*) Dr. Vinocur found that Q.B. was having difficulty getting on a regular bowel regimen. (*Id.*) He was taking three ex-lax® per day, but was on an irregular schedule for toilet training secondary to care issues. (*Id.*) His rectal prolapse was stable. (*Id.*) He was not experiencing any runny stools, but was incontinent for stool and urine. (*Id.* at 712.) Brown reported that Q.B. had better stool continence at night when he ate three ex-lax® bars. (*Id.*) She tried to have Q.B. sit on the toilet for fifteen minutes at a time throughout the day, but this occurred infrequently and inconsistently due to her work schedule. (*Id.* at 712-13.) Dr. Vinocur encouraged Brown to work on a regular regimen amongst all of Q.B.'s caregivers, continue to use three ex-lax® per day, have Q.B. sit on the toilet for fifteen minutes in the morning at the very least, and to

continue to keep a log of his toilet training. (*Id.* at 643.)

On May 13, 2010, Dr. Vinocur submitted a letter in support of Q.B.'s SSI application, in which he noted that Q.B. "has been incontinent of stool and may always be incontinent of stool." (*Id.* at 771.) He further stated that Q.B. was too young and hyperactive to be put on an enema program. (*Id.*) Dr. Vinocur noted that the purpose of his letter was to ensure that Brown would be "able to get the resources for [Q.B.] when he goes to school." (*Id.*) He stated that Q.B. "will need the ability to go to the bathroom at any time" and have access to a bathroom "so that he does not undergo social isolation." (*Id.*) Dr. Vinocur stated that progress has been made in Q.B.'s treatment, though it was "a slow process," and we "need to do everything possible to support him emotionally and physically in a school environment. (*Id.*)

### 2. The administrative hearing

An administrative hearing was held on June 24, 2010. Q.B., who was four at the time, was not required to attend, given his young age. (D.I. 11, Tr. 777.) Q.B. does not understand his condition. (*Id.* at 787.) Brown, who was represented by counsel, appeared and testified.

The ALJ advised Brown that, because Q.B. was in preschool, all six areas of function may not apply. Brown testified that Q.B. has limitations in acquiring and using information and learning new things due to the fact that he goes to the bathroom so much that it will interfere with learning. (*Id.* at 781.) At the time of the hearing, Q.B. was not in school, but in daycare. (*Id.*)

Brown testified that Q.B. has not had any treatment for scoliosis. (*Id.* at 781.) Brown was informed by a physician that the treatment consisted of surgery. (*Id.*)

Q.B. takes Benefiber, senna and ex-lax® for his intestinal condition. (*Id.* at 782.) Q.B.

sees his G.I. physician, Dr. Vanoker, approximately once a month.  (*Id.*)  As of the date of the

hearing, Q.B. had been seeing Dr. Vanoker for approximately one year.  (*Id.* at 788.)  Dr.

Vanoker monitors Q.B.'s progress in using the bathroom.  (*Id.* at 783.)  He wants Q.B. to become

potty trained so that he can undergo an operation.  (*Id.*)  At the time of the hearing, Q.B. did not

have muscle control of his bowel movements and used disposable diapers.  (*Id.* at 783-784.)  Dr.

Vanoker asked Brown to keep a log of how often Q.B. goes to the bathroom and she "filled up a

whole page in one day."  (*Id.* at 789.)

Q.B. does not have much control over the muscle in his bowels.  (*Id.* at 789.)  Brown

testified this resulted from surgery Q.B. underwent when he was born.  (*Id.*)  At the time of the

hearing, Q.B. was not yet potty trained or able to clean up after himself.  (*Id.* at 788.)  Q.B. takes

laxatives daily so that he does not become constipated and so that his stool is soft.  (*Id.* at 784.)

Once Q.B. eats, he has to use the bathroom.  His diaper is changed ten to fifteen times per day.

(*Id.* at 784-785.)  Q.B.'s daycare provider understands his condition and, in a typical day,

changes his diaper anywhere from seven to ten times.  (*Id.* at 785.)  Brown explained that, if the

prolapse returned, another surgery would be necessary.  (*Id.* at 790.)  Q.B.'s condition causes his

stomach to hurt, and he become frustrated and whiney.  (*Id.* at 790-791.)

Q.B. is not on a special diet.  Brown testified that Q.B. cannot have many bananas, but he

can have yogurt because it helps with his digestive system.  (*Id.* at 785.)  Q.B.'s appetite is not

very good, and he is a picky eater.  (*Id.* at 786.)  His height and weight are "fine" for his age and

his sleep is "fine."  (*Id.*)

Q.B. does not play very well with other children at the daycare and does not have any

12

friends his own age at the daycare.  (*Id.* at 786, 791.)  He does not have a friend with whom he

has bonded, nor does he get along very well with his other sibling.  (*Id.* at 787, 791.)

### 3. The ALJ's Findings

Based on the factual evidence and the testimony of Brown, the ALJ determined that Q.B.

has not been disabled within the meaning of the Act since August 1, 2008, the date the

application was filed.  The ALJ's findings are summarized as follows:[6]

> 1. The claimant was born on June 20, 2006.  Therefore, he was an older infant on
> August 1, 2008, the date the application was filed, and is currently a preschooler
> (20 C.F. R. § 416.926a(g)(2)).
>
> 2. The claimant has not engaged in substantial gainful activity since August 1,
> 2008, the application date (20 C.F.R. § 416.924(b) and § 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairment:  history of congenital
> imperforate anus (20 C.F.R. § 416.924(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that
> meets or medically equals one of the listed impairments in 20 C.F.R. Part 404,
> Subpart P, Appendix 1 (20 C.F.R. §§ 416.924, 416.925, and 416.926).
>
> 5. The claimant does not have an impairment or combination of impairments that
> functionally equals the listings (20 C.F.R. §§ 416.924(d) and 416.926a).
>
> 6. The claimant has not been disabled, as defined in the Act, since August 1,
> 2008, the date the application was filed (20 C.F.R. § 416.924(a)).

(D.I. 11, Tr. 12-27.)

---

[6]The ALJ's rationale, which was interspersed throughout the findings, is omitted from
this recitation.

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of "evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250(1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50( a), "which is that the trial judge must direct a verdict if, under the governing law,

there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Id.* at 250-51 (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F .2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process for Children

The Supplemental Security Income program provides benefits to disabled children if they meet certain income and resource limitations. *See* 42 U.S.C. § 1381 *et seq.* The statute provides that a child under eighteen "shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in

marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at § 1382c(a)(3)(C)(i).

The regulations promulgated by the Commissioner of the Social Security Administration provide a three-step analysis the agency deploys in determining whether a child is disabled under the statute. First, if the child "is doing substantial gainful activity," he will be deemed not disabled. 20 C.F.R. § 416.924. Second, the agency will consider whether the child suffers from a "physical or mental impairment" or from a "combination of impairments" that is "severe." If the impairment or combination of impairments is not severe, the child will be deemed not disabled. *Id.* Third, the agency will decide whether an impairment or combination of impairments, if found to be severe, "meets, medically equals, or functionally equals the listings." If so and, if the impairment also meets the durational requirement, the agency will enter a finding of disability. *Id.*; *see Morrison ex rel. Morrison v. Commissioner of Soc. Sec.*, 268 F. App'x 186, 187 (3d Cir. 2009) (unpublished) ("A child under eighteen is only eligible for SSI benefits if (1) he is not doing substantial gainful activity; (2) he has a medically determinable impairment or combination of impairments that is severe; and (3) the impairment or combination of impairments meets, medically equals, or functionally equals the severity of one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.").

The regulations further provide that an impairment or combination of impairments "functionally equals" a listed impairment if it "result[s] in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The six

16

domains used to assess the child's functional limitations are: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." *Id.* at § 416.926a(b)(1). A limitation is "marked" when it "interferes seriously with [the child's] ability to independently initiate, sustain or complete activities." *Id.* at § 416.926a(e) (2)(i). A limitation is "extreme" when it "interferes very seriously with [the child's] ability to independently initiate, sustain or complete activities." *Id.* at § 416.926a(e)(3)(i).

### B. Whether ALJ's Decision is Supported by Substantial Evidence

In her decision, the ALJ determined that Q.B. had not worked since August 1, 2008. (D.I. 11, Tr. 15.) The ALJ found that Q.B. had a history of congenital imperforate anus, which is "severe" under the Commissioner's regulations, but that his congenital scoliosis/hemivertebrae was non-severe because it caused no more than minimal functional limitations. (*Id.* at 15-17.) Next, the ALJ found that Q.B.'s impairments did not meet or medically equal any of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (*Id.* at 17.) In addition, the ALJ found that Q.B.'s impairments did not result in either marked limitations in two domains of functioning or an extreme limitation in one domain of functioning such that he would functionally equal a listing. (*Id.* at 17-27.) Accordingly, the ALJ found Q.B. not disabled.

In Brown's motion, she seeks an award of SSI benefits on behalf of Q.B. based upon his physical impairments. (D.I. 15.) Brown assigns no error, but contends that Q.B.'s condition warrants an award of benefits. The Commissioner moves for summary judgment on the grounds that substantial evidence supports the ALJ's finding that Q.B.'s impairments do not functionally

17

equal the criteria of any listing.  In addition, she argues that the court cannot consider evidence submitted to this court that was never presented to the ALJ or the Appeals Council.

In her decision, the ALJ carefully evaluated and discussed the evidence of record.  She provided reasons for assigning great weight to the opinions of the state agency consultants  over the opinions of Q.B.'s treating physicians.  An ALJ is free to choose one medical opinion over another where the ALJ considers all of the evidence and gives some reason for discounting the evidence she rejects.  *See Diaz v. Commissioner of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009); *Plummer*, 186 F.3d at 429 ("An ALJ . . . may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.").

In addition, she considered each of the six domains of functional equivalence in finding Q.B. not disabled.  With regard to acquiring and using information, the record supports the ALJ's determination that Q.B. had no limitation in this domain.  In assessing this domain, the ALJ considers how well a child acquires or learns information, and how well he can use the information he has learned.  *See* 20 C.F.R. § 416.926a(g).  The record reflects that Q.B. had fairly normal development and met his developmental milestones.  Function Reports indicate that Q.B. was able to talk and had no difficulties understanding or learning.

With regard to attending and completing tasks, the evidence of record supports the ALJ's finding that Q.B. had no limitation in this domain.  This domain gauges how well a child is able to focus and maintain attention, and how well he begins, carries through and finishes activities, including the pace at which he performs them and the ease in which he changes them.  *See* 20 C.F.R. § 416.926a(h).  As previously discussed, Q.B. had fairly normal development, met his developmental milestones, was able to talk, and had no difficulties understanding or learning.

18

With regard to interacting and relating with others, the evidence of record supports the ALJ's finding that Q.B. had no limitation in this domain. The domain of interacting and relating with others considers how well the child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. *See* 20 C.F.R. § 416.926a(i). As the ALJ noted, Brown testified that Q.B. did not get along with his sibling and on one occasion, Brown saw him play by himself rather than with other children at daycare. However, the February 2008 Function Report states that Q.B.'s impairment did not affect his behavior with others. In contrast, the August 2008 Function Report states that Q.B.'s impairment did affect his behavior with others. Yet, Q.B. was affectionate towards his parents, played next to other children, and played "catch" or other simple games with other children. In addition, the record indicates that Q.B. was alert, cooperative, and playful during physical examinations. Finally, the evidence of record did not reflect social isolation at the time of the ALJ's decision.

With regard to moving about and manipulating objects, the evidence of record supports the ALJ's finding that Q.B. had no limitation in this domain. This domain considers how well a child is able to move his body and objects. *See* 20 C.F.R. § 416.926a(j). As previously mentioned, Q.B. had fairly normal development and met his developmental milestones. Nor did Brown testify to any limitations in this domain. A function report indicates that Q.B.'s physical abilities were not limited and that his activity level was normal. In addition, medical records indicate that Q.B. was not restricted in his physical activities. He had no neurological deficits, his motor strength and reflexes were normal, and he had a non-antalgic gait.

With regard to caring for yourself, the evidence of record supports the ALJ's finding that Q.B. was not limited. This domain considers how well a child maintains a healthy emotional and physical state, including coping with stress and change, and whether a child takes care of his own health, possessions and living area. *See* 20 C.F.R. § 416.929a(k). The record reflects that Q.B. assisted in dressing himself. He had fairly normal development and, although he was not toilet trained, was able to tell others when he had to urinate or needed his diaper changed. In addition, the Function Report indicates that Q.B. had no limitation in his ability to assist with taking care of his personal needs. By September 2009, Q.B. was stooling less frequently than before and woke up clean in the morning.

Finally, with regard to health and physical well-being, the evidence of record supports the ALJ's finding that Q.B. had a less than marked limitation in this domain but those limitations did not rise to the level of being "marked" or "extreme" under the regulations. This domain considers the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on the child's health and functioning that were not considered in the child's ability to move about and manipulate objects. *See* 20 C.F.R. § 416.929a(l). The ALJ thoroughly and exhaustively considered all of the relevant evidence of record relating this domain. The record reflects that Q.B. has some limitations in his health and physical well-being given his medical condition. The ALJ observed that some of the limitations were not unusual, inconsistent, or inappropriate given Q.B.'s young age. Moreover, the ALJ considered that Q.B. did not ignore a bowel movement and would tell someone if his diaper needed changing.

The ALJ found that Q.B. did not have a marked limitation in two or more domains and did not have an extreme limitation in any of the six domains. Upon a review of the record as a

whole, the court concludes that the ALJ's findings are supported by substantial evidence of record. Therefore, the court will deny Brown's motion for summary judgment and will grant the Commissioner's motion for summary judgment.

### C. New Evidence

Brown submitted numerous medical and school records dated subsequent to the ALJ's July 21, 2010 decisions, none of which were before the ALJ when she rendered her decision. In addition, Brown submitted medical records for March 17, May 12, May 13, and June 30, 2010. Again, these were not before the ALJ when she rendered her decision on July 21, 2010. (*See* D.I. 15, 21.)

When a claimant submits evidence after the ALJ's decision, that evidence cannot be used to challenge the ALJ's decision on the basis of substantial evidence. *See Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). Pursuant to 42 U.S.C. § 405(g), sentence six, this court may, however, order a remand based upon evidence submitted after the ALJ's decision, but only if the evidence satisfies three prongs: (1) the evidence is new; (2) the evidence is material; and (3) there was good cause why it was not previously presented to the ALJ. *Matthews*, 239 F.3d at 593.

Here, Brown does not meet the required prongs. First, the majority of the evidence is new and, hence, is not material to plaintiff's claim for benefits from August 1, 2008, the date of the application, to July 21, 2010, the date of the ALJ's decision. Most of new records speak to a time after the disability period in question. "[A]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously

21

non-disabling condition." *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984); *See also Nieves v. Commissioner of Soc. Sec.*, 198 F. App'x 256, 260, n.3 (3d Cir. 2006) (unpublished) ("Our determination [that the ALJ's decision in 2001 was based on substantial evidence] is in no way swayed by the fact that in October of 2003 an ALJ determined that the petitioner was disabled.  As per 42 U.S.C. § 405(g), [the court's] review is limited to the evidence in the record at the time of the 2001 decision of the ALJ and [it is] therefore not required, nor able, to consider this subsequent ALJ ruling when rendering [its] decision."); *Bruni v. Astrue*, 773 F. Supp. 2d 460, 473-74 (D. Del. 2011) ("The fact that [a] subsequent application was successful does not itself meet the new evidence standard articulated in *Szubak*.").  Second, Brown provided no explanation, much less good cause, for her failure to present the March 17, May 12, May 13, and June 30, 2010 records to the ALJ.  Hence, the court finds no basis to remand pursuant to the sixth sentence of 42 U.S.C. § 405(g).

The new medical and school records submitted by Brown that are dated after July 21, 2010, are not material to the question of whether Q.B. was disabled on or before the ALJ's July 21, 2010 decision denying benefits.  Moreover, Brown failed to provide good cause for her failure to present the March through June 2010 records to the ALJ or the Appeals Council. Accordingly, Brown has failed to provide a basis for a sentence six remand.[7]

---

[7]Brown has available the option of filing a new application should she believe the new evidence supports an award for SSI benefits on behalf of Q.B.  *See* 20 C.F.R. § 416.330(b).

## V.  CONCLUSION

For the reasons stated above, the court will deny Brown's motion for summary judgment and will grant the Commissioner's motion for summary judgment.  The decision of the Commissioner will be affirmed.

An appropriate order shall issue.

CHIEF, UNITED STATES DISTRICT JUDGE

_____ 26 , 2013
Wilmington, Delaware